## HOLLIMAN v. SOUTHERN KRAFT CORPORATION. *
### No. 4915.

Court of Appeal of Louisiana. Second Circuit.

Dec. 5, 1934.

Madison, Madison & Fuller, of Bastrop, for appellant.

Todd & Todd, of Bastrop, for appellee.

TALIAFERRO, Judge.

Plaintiff, while performing the duties of the contract of hiring between himself and defendant, at the defendant's paper manufacturing plant in the city of Bastrop, La., admittedly suffered serious injury to the left ankle, and a compound, comminuted fracture of the lower fourth of the left leg. To save his life, the foot was ultimately removed. The accident in which said injuries occurred happened in the nighttime, July 29, 1931. He was immediately carried to a sanitarium of defendant's selection and treated at defendant's, or its insurer's, expense for three or four months, and thereafter, it appears, at plaintiff's own expense; payments on that account being made from the compensation paid to him. Defendant conceded liability for compensation at the weekly rate sued for for 125 weeks, as in case of loss of use of a foot, and made payments regularly for that period; but, denying any further responsibility to plaintiff for compensation, refused to make additional payments. This suit was instituted March 19, 1934, to recover compensation at the weekly rate of $10.75 for 400 weeks, less the amount previously paid, as in case of permanent total disability to do work of any reasonable character. Paragraph (b) of subsection 1 of section 8 of Act 20 of 1914, as amended.

Defendant's position is that whatever disability plaintiff now has, beyond that which, of necessity, followed as a consequence of the loss of his foot, is not due to, nor has it any causal connection, directly or indirectly, with the trauma he suffered at its mill. It is contended that the breakdown in plaintiff's physique is due entirely to central nervous system syphilis contracted since the date of the injury.

The record does not disclose the date the foot was amputated, but this was done more than one year after the accident, as it occurred after he was finally discharged from the sanitarium. In June, 1932, while in the sanitarium, he was operated on for acute appendicitis. The gravamen of plaintiff's complaint, as relates to the nature and character of his injuries, is embodied in paragraph 5 of his petition, which we quote:

"Your petitioner shows and represents that in said accident he received personal injuries,—injuries to his back, shoulders, arms, chest, abdomen, intestines, kidneys, uretha and bladder and regions thereabout, and received injuries to his legs and especially crushing his left leg which it was necessary to amputate in order to save petitioner's life and that he received other external and internal injuries, and on account of his weakened condition since said date and all on account of the injuries received by him as aforesaid, has caused your petitioner to contract tuberculosis, from which he is now suffering; that said injuries caused your petitioner to

be a nervous wreck, that he is unable to sleep at night, that he has headaches and suffers excruciating pain and agony always and at times has the complete loss of use of his body, on which occasions he has to be raised out of bed and given stimulants; all of which injuries totally incapacitate your petitioner from doing or performing manual labor, and your petitioner has been so totally incapacitated since the date of said accident, all of which said injuries were received by your said petitioner in said accident, received as aforesaid, in the course of his employment with said Southern Kraft Corporation, on or about July 29, 1931."

The injuries and results detailed in this quotation are alleged to have produced a state of permanent total disability.

The lower court, after hearing many witnesses, lay and medical, give testimony, ruled in favor of plaintiff, and gave judgment as by him prayed for. This appeal is prosecuted by defendant. Plaintiff answered the appeal, praying that the judgment be affirmed with damages of $500; arguing that the appeal is purely frivolous, taken to harass him, and out of a belief that he would probably die before a final decision could be reached in the case.

It is not seriously contended that plaintiff, from the time he was injured to the date of trial, was totally incapacitated to perform manual labor, the only kind of work he was competent to perform before being injured. We think the testimony abundantly sustains plaintiff's allegations that his disability is both total and permanent.

That plaintiff had a harrowing experience, from the nature of which it would normally be expected he would have received physical injuries, externally and internally, of a most serious nature, cannot be well gainsaid. He was directed by a superior employee to get in a trough, some 75 feet long and 14 inches wide, elevated at an angle of 45 degrees, on the bottom of which runs a metal endless conveyor chain, and do what was necessary to cause the chain to carry a maximum of bark along the trough to another trough running at right angle to it, and thence to an incinerator. In complying with this order, plaintiff's left foot was fouled in the chain so firmly that he was unable to disengage it. He fell, or sat down, with his back facing the direction the chain was going, and in this predicament he was borne at the rate of 175 feet per minute towards and over a sprocket wheel at the farther end of the trough. On the journey towards the sprocket wheel, natural-

ly, he exerted violent physical effort to extricate his foot from its fastening and escape what appeared to be certain death from mangling in and about the wheel. His body was carried over the wheel and fell a distance of some 18 inches across the sharp sides of the other trough; his foot all the time being held fast in the chain. The fracture occurred as his body went over the wheel. As the chain began its return to the drum at the lower end of the trough, plaintiff's leg to the knee became involved and was pulled in that direction, and while the situation was thus, the power operating the chain was cut off by a fellow employee. This saved his life. Fifteen minutes were consumed in extricating plaintiff's leg from the chain. He was then experiencing excruciating physical pain and suffering. He was taken immediately to the sanitarium in Bastrop. His body was examined but, according to the testimony of those making the examination, no injury was found save the fractured leg. No X-ray pictures were made at the time; apparently the examination was superficial. Against this testimony negativing the presence of any exterior signs of injury on plaintiff's body, except the fractured leg and injured ankle, we have the evidence of plaintiff's mother, stepfather, and one or two other witnesses, who say there were many wounds on the upper part of his back when they saw him in the sanitarium, and that they observed gauze bandages thereon. During the trial plaintiff bared his back in court and Dr. Sims pointed out scars thereon as follows: Two on right scapula, three on left scapula, two at lower border of ribs, left side, posteriorly, one above left knee, and some around right knee. Plaintiff testified that these scars all followed healing of wounds caused by the accident. The wounded leg did not readily respond to the treatment administered. Osteomyelitis set up. A Wasserman test was made, which showed negative. This test was made to exclude syphilis, if it did not exist, as a contributing factor to the slow healing of the wounded leg. It is not contended, however, that such a test is infallible. It may disclose negative, whereas syphilis exists.

At the end of approximately four months, for financial reasons, plaintiff was directed to leave the sanitarium and go home. He did this. His mother called in a physician to prescribe for him, but the leg's condition was found to be so very bad that this doctor advised him to return to the sanitarium for further treatment. This was done and from that time on for eight or nine months he was treat-

ed at the sanitarium. When discharged the fractured leg was not entirely well. It was running pus from one opening. Aside from this, his appearance, according to the physician operating the sanitarium, indicated good physical condition.

Plaintiff was 17 years old when injured. He then enjoyed excellent health, being physically strong and robust. He performed the heavy duties of his employment to the entire satisfaction of his superiors. He had never suffered any of the serious diseases and ailments which now afflict him. When this case was tried he had fallen off in weight around twenty pounds, and in all respects was a rather poor representative of his former physique. He was then suffering from chronic constipation, urine retention, back and head aches, tuberculosis, in its incipiency or in an arrested state, and syphilis. In the year 1933 he had two slight strokes of paralysis. His condition during this year became noticeably worse, and, after payments of compensation had been discontinued for a few months, in March, 1933, Dr. J. N. Jones was called to examine and prescribe for him. At that time he discovered that plaintiff was suffering from urine retention, constipation, pains over most of his body, and facial paralysis, with one arm slightly involved. He trained plaintiff to the use of a catheter to void his urine. Use of the catheter was continued from then on. Dr. Jones continued to observe and treat him thereafter. He also found decided atrophy of the left leg to the hip. He had a specimen of plaintiff's sputum examined and it disclosed positive tuberculosis bacilli. He found no superficial evidences of syphilis, and was certain he was totally disabled.

Plaintiff was closely examined by Dr. McKoin in January, 1934, and he found his physical condition very much below normal. He was complaining of pains in his chest and back and the examination was made primarily to determine the cause of such. Dr. McKoin, from X-ray pictures, found both kidneys not in normal position and condition; the right being lower than the left and kinked, from which it eventually will be destroyed; inability to urinate without catheterization, constipation, and temperature. It was his opinion that these troubles were the aftermath of the injury in July, 1931. He made several examinations of plaintiff to time of trial, and found no improvement in his condition during the time.

Other physicians who testified in behalf of plaintiff were of the opinion, after examining him several times, and informing themselves as to the history of his injury and subsequent experiences, that he was totally and permanently disabled, and that this disability would be present even if he had not lost his foot by amputation.

Dr. Garnier, and other physicians, testifying for defendant, was firm in the opinion that the syphilitic condition found by them in plaintiff caused nearly all of his present disability, aside from loss of foot, including the two strokes of paralysis in 1933. This is probably true, but we think the original injury activated the dormant syphilitic germ.

It is shown that the syphilitic germ is heritable. The disease is infectious. It may be communicated by sexual intercourse. It is also shown that many persons who have the germ in their system through inheritance are never conscious of it. It is not activated during life to that degree that its presence becomes known.

In the present case, plaintiff being largely sapped of his youthful vitality by the effect of his injury and long suffering, was entirely ignorant that syphilitic germs dwelt in his body. His mother and stepfather were likewise ignorant of such fact, yet, we think, the record sustains the conclusion that such was the case. The fact that the injured leg would not heal, after prolonged treatment, is persuasive of the inference that there was something in plaintiff's system which militated against prompt healing. Plaintiff, himself, says that he is now impotent and that he has not known a woman since being injured. It is not questioned that lurking syphilitic and tubercular germs, as well as others, will flare up from their dormant state and make progress towards destruction of human life the moment the body's powers of resistance to such disease germs have been reduced or destroyed from any cause. When we take into consideration the nature of the accident to plaintiff, his long suffering in the sanitarium from the fractured leg and injured ankle, the operation for appendicitis, amputation of the foot to prevent death from blood poisoning, pains and aches involving practically all his body, it is not difficult to understand, and to be convinced, that almost any disease to which humanity is heir could thereafter easily infest the body; especially those diseases which are caused from germs which thrive when the body is sapped of its power to successfully resist their attack.

We think, after a close study of the record, that we are justified in concluding that had it not been for the accident to plaintiff, followed by much suffering and long confine-

ment, he would not to-day be totally disabled. If we are correct in this conclusion, and we feel no uncertainty thereof, then it must follow as a corollary that this disability was superinduced by diseases brought into existence as a direct result of the original injury and the complications arising therefrom. A disability brought about by such a train of facts and circumstances is compensable. Disability arising purely from the fact of amputation is not compensable beyond the amount and for the period fixed for specific cases. Calhoon v. Meridian Lumber Co. (La. App.) 151 So. 778.

But where, as in this case, total and permanent disability is brought about by causes independent of the fact of amputation of the foot, or by causes to which the fact of amputation must be a complement to produce the disability, compensation is recoverable under paragraph (b) of subsection 1 of section 8 of the Workmen's Compensation Law as amended.

 Appellee's charge that this appeal is frivolous is not well founded. It is not manifest that the appeal was taken for delay, nor that appellant did not have faith in the merits of its contention. Beaird v. Ward, 7 La. App. 117; Silberberg v. Kalil & Mickal, 159 La. 560, 105 So. 620.

The judgment appealed from being, in our opinion, correct, it is hereby affirmed.